******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

131 BEACH ROAD, LLC *v.* TOWN PLAN AND
ZONING COMMISSION OF THE
TOWN OF FAIRFIELD
(SC 20808)
(SC 20810)

ALDEN H. STEVENS ET AL. *v.* TOWN PLAN
AND ZONING COMMISSION OF THE
TOWN OF FAIRFIELD
(SC 20811)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Clark, Js.

*Syllabus*

Pursuant to statute (§ 8-30g (a) (2)), an "affordable housing application" is
defined as "any application made to a [zoning] commission in connection
with an affordable housing development . . . ."

Pursuant further to statute (§ 8-30g (g) (1)), in an appeal from a zoning
commission's denial or conditional approval of an affordable housing
application, it is the zoning commission's burden to demonstrate, based
on the evidence in the record, that "(A) the decision [being appealed]
is necessary to protect substantial public interests in health, safety or
other matters which the commission may legally consider; (B) such
public interests clearly outweigh the need for affordable housing; and
(C) such public interests cannot be protected by reasonable changes
to the affordable housing development . . . ."

The plaintiff, which owned real property in the town of Fairfield, filed an
application with the defendant town plan and zoning commission, seek-
ing a text amendment to the town's zoning regulations, as well as the
approval of a site plan and the issuance of a certificate of zoning compli-
ance, in connection with the plaintiff's plan to build an affordable hous-
ing development on its property. The proposed development consisted
of a forty unit, five story building that had a maximum height of sixty feet.
The plaintiff's property, however, was located in the town's residence
A zone district, wherein permissible uses were limited to single family
dwellings that have a maximum height of two and one-half stories or
thirty-two feet. Following a public hearing, the commission denied the
plaintiff's request for a text amendment to the zoning regulations, which
would have created a new permissible use for affordable housing within
the residence A zone district, but conditionally approved the plaintiff's
request for a site plan and certificate of zoning compliance, provided
that the plaintiff, inter alia, reduced the height of the proposed building

to no more than three stories, with a maximum height of forty feet. The commission explained that its reason for imposing the height condition was that the building, as proposed by the plaintiff, would be visible from one of the town's historic districts, that such visibility would vitiate the integrity of the historic district, and that preserving the historic district was a substantial public interest that the commission could legally consider under § 8-30g (g). The plaintiff appealed from the commission's decision to the trial court, and four intervenors, who owned property abutting or within 100 feet of the plaintiff's property, intervened in the plaintiff's zoning appeal and also filed their own zoning appeal. The trial court consolidated the appeals. The trial court then concluded that the plaintiff's request for a text amendment was part of an "affordable housing application" to which § 8-30g (g) applied and that the commission had improperly failed to apply § 8-30g (g). Accordingly, the court sustained the plaintiff's appeal with respect to the text amendment. With respect to the commission's conditional approval of the site plan and certificate of zoning compliance, the trial court sustained the plaintiff's appeal and dismissed the intervenors' appeal on the ground that the commission had not met its burden of demonstrating that the height condition it imposed was necessary to protect a substantial public interest that outweighed the need for affordable housing in the town, especially because the proposed development was not itself located in the historic district. On the granting of certification, the plaintiff and the intervenors filed separate appeals from the trial court's judgments. *Held*:

1. The trial court correctly concluded that the commission had improperly imposed a height condition on its approval of the plaintiff's site plan and certificate of zoning compliance:

The town and the intervenors claimed that the adverse visual impact of the proposed development in the residence A zone district on the neighboring historic district was sufficient to override the need for public housing in the town, and, although this court agreed that historic preservation is among the panoply of interests that a zoning commission properly may consider under § 8-30g (g), under the circumstances of this case, the particular nature of the out-of-district impact failed to implicate a substantial interest in historic preservation, insofar as it was not clear that there was a public interest in the protection of viewsheds from historic districts, especially views extending into other zoning districts.

It is a fundamental precept of zoning law that different zoning districts will permit different and sometimes incompatible uses subject to different regulations, historic districts by their very nature are particularly apt to encounter abrupt transitions at their boundaries, and, as the trial court observed, the plaintiff's proposed building was within 500 feet of more than 80 commercial businesses, including a gas station, a car dealership, a shopping center, and medical offices, such that the nature and extent of the commercial activity prevalent in the neighborhood

undermined the commission's and the intervenors' assertion that the height restriction on the proposed development in the residence A zone district was necessary to protect a substantial public interest in the historic preservation of buildings located in a different zoning district.

Moreover, it was also significant that the statute (§ 7-147a (b)) authorizing municipalities to create historic districts focuses on the distinctive characteristics of historic places and structures, and contained no indication that the public interest in historic preservation included consideration of the potential visibility from the historic district of a building or structure that would be located entirely in another zoning district.

Furthermore, the scope of authority afforded to a historic district commission by statute (§ 7-147s) was limited to consideration of architectural features of historic buildings and structures within historic districts, and, thus, the imposition of limits on the construction of affordable housing outside of a historic district was not part of the statutory scheme.

Even if this court assumed that the legislature had intended that a substantial public interest in historic preservation would extend to surrounding districts within view of the historic district, and that the commission's decision in the present case was necessary to protect a substantial public interest in historic preservation, the commission failed to demonstrate that the height restriction it imposed to protect that interest clearly outweighed the need for affordable housing in the town.

In addition, this court rejected the intervenors' assertion that the trial court had improperly substituted its own judgment for that of the commission with respect to whether the height restriction the commission imposed was necessary to protect a substantial public interest that outweighed the need for affordable housing, especially given the manifest weight of the evidence in the record.

2. This court concluded that § 8-30g (g) applied to the plaintiff's request for a text amendment to the extent that that request sought a change in the zoning regulations applicable to the plaintiff's specific property, on which the proposed affordable housing development was to be constructed, but that § 8-30g (g) did not apply to the plaintiff's request for a text amendment to the extent that it sought to amend the zoning regulations by creating a new permissible use throughout the entire residence A zone district:

Whether § 8-30g (g) applied to the plaintiff's request for a text amendment turned on whether it was submitted "in connection with" the plaintiff's affordable housing development for purposes of § 8-30g (a) (2), and a review of the relevant case law led this court to conclude that, because the plaintiff planned to construct an affordable housing development on a specific parcel of land, and its application for a text amendment was submitted as part of its application for a site plan approval to develop

affordable housing units on the subject property, the plaintiff's application for a text amendment was filed "in connection with" the plaintiff's affordable housing development within the meaning of § 8-30g (a) (2), as the plaintiff's application sought to change the text of the zoning regulations governing the subject property.

To the extent, however, that the plaintiff's proposed text amendment was not limited to the affordable housing development on its property but, rather, sought to change the regulations governing the entire residence A zone district, including parcels that were not to be a part of the planned affordable housing development, it was not submitted "in connection with" an affordable housing development, and construing the statute otherwise would be inconsistent with the statutory language, as well as the legislative intent and purpose of the statute, namely, to encourage and facilitate the much needed development of affordable housing.

Moreover, with respect to the concern that this court's construction of the term "affordable housing application" in § 8-30g (a) (2) could be understood as an endorsement of impermissible spot zoning, the legislature has determined that affordable housing developments that meet the statutory criteria set forth in § 8-30g are in the best interests of the community, insofar as such developments provide fair access to housing and expand housing opportunities for the citizens of this state, and that granting an affordable housing application limited to a specific parcel of land does not constitute spot zoning.

Accordingly, consistent with the positions taken by the parties, and pursuant to the broad remedial powers afforded by § 8-30g (g), this court reversed in part the trial court's judgments and remanded the case with direction that the commission grant the plaintiff's application for a text amendment only as it effectuates a change in the zoning regulations that govern the plaintiff's property.

Argued December 15, 2023—officially released July 11, 2024*

*Procedural History*

Appeals from the decision of the defendant plan and zoning commission denying in part and conditionally approving in part the application for approval of an affordable housing development filed by the plaintiff 131 Beach Road, LLC, in the first case, brought to the Superior Court in the judicial district of Fairfield, where the court, *Stevens, J.,* granted the motion to intervene

---

* July 11, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

as defendants in the first case filed by Alden H. Stevens et al.; thereafter, the cases were transferred to the judicial district of Hartford, Land Use Litigation Docket, and consolidated; subsequently, the plaintiff 131 Beach Road, LLC, intervened as a defendant in the second case; thereafter, the cases were tried to the court, *Hon. Marshall K. Berger, Jr.*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgments sustaining the appeal in the first case and dismissing the appeal in the second case, from which the defendant plan and zoning commission in the first case, the defendants Alden H. Stevens et al. in the first case, and the plaintiffs in the second case, on the granting of certification, filed separate appeals; subsequently, the appeals were consolidated. *Reversed in part; judgments directed.*

*Barbara M. Schellenberg*, for the appellant in SC 20808 and the appellee in SC 20810 and SC 20811 (defendant Town Plan and Zoning Commission of the Town of Fairfield in both cases).

*Joel Z. Green*, with whom was *Linda Pesce Laske*, for the appellants in SC 20810 and SC 20811 and the appellees in SC 20808 (defendants Alden H. Stevens et al. in the first case, plaintiffs in the second case).

*Christopher J. Smith*, with whom was *Russell D. Liskov*, for the appellee in SC 20808, SC 20810 and SC 20811 (plaintiff in the first case, defendant 131 Beach Road, LLC, in the second case).

*Opinion*

ECKER, J. These consolidated appeals challenge the judgments of the trial court reversing the decision of the defendant, the Town Plan and Zoning Commission of the Town of Fairfield (commission), on the two part application filed by the plaintiff, 131 Beach Road, LLC, to construct a forty unit, multifamily affordable housing

development near Fairfield's Old Post Road Historic District (historic district).[1] The commission denied the first part of the plaintiff's application, which sought a zone text amendment to permit multifamily affordable housing units within the residence A zone district. It approved the second part of the plaintiff's application, which sought a site plan and a certificate of zoning compliance, but imposed two conditions on its approval, one of which limited the height of the proposed building and thereby reduced the number of affordable housing units. The trial court sustained the plaintiff's zoning appeals pursuant to General Statutes § 8-30g (g), concluding in relevant part that the commission had failed (1) to consider the zone text amendment in light of the requirements of § 8-30g, and (2) to satisfy its statutory burden of establishing that the height condition was necessary to protect a substantial public interest that outweighed the need for affordable housing in Fairfield. We agree with the trial court that the commission improperly imposed a height condition on its approval of the plaintiff's site plan and certificate of zoning compliance, and improperly denied the zone text amendment insofar as it applied to the proposed development at issue in this appeal, but we disagree that the commission improperly denied the zone text amendment insofar as it applied to the entire residence A zone district.

The plaintiff is the owner of 131 Beach Road in Fairfield (subject property), which consists of 0.65 acres and is located within 600 feet of the Fairfield town hall and within 500 feet of the historic district. The subject property is within the residence A zone district, as defined by Fairfield's zoning regulations, which provide

---

[1] Four intervenors—Alden H. Stevens, Patricia P. Stevens, John Kubica, and Judith A. Kubica—also challenge the legality of the commission's decision. The intervenors each own property that abuts or is within 100 feet of 131 Beach Road. See General Statutes § 8-8 (a) (1). We hereinafter refer to the commission and the intervenors collectively as the defendants, unless the context requires specificity.

that the permissible uses therein are limited to "[a] single detached dwelling for one . . . family" with a maximum height of "[t]wo and [one-half] . . . stories or thirty-two . . . feet, whichever is less . . . ."

The plaintiff submitted a two part application to the commission. One part of the application requested a zone text amendment that would permit multifamily, residential dwellings for rent or sale within the residence A zone district, provided that at least 30 percent of the dwelling units constructed therein are "rented or sold at, or below, prices which will preserve the dwelling units as housing for families, as provided by [the affordable housing statute, §] 8-30g . . . ." The proposed text amendment also required, among other things, that the buildings have a minimum lot area of 0.5 acres, a location within 600 feet of the Fairfield town hall, a maximum building height of 60 feet or 5 stories, and a minimum of 1.25 parking spaces per unit.

The second part of the plaintiff's application sought approval of a site plan and issuance of a certificate of zoning compliance to permit a multifamily residential community on the subject property. The plaintiff proposed the construction of a five story building, containing forty residential units, that would qualify as affordable housing under § 8-30g. See General Statutes § 8-30g (a) (6) (defining affordable housing in relevant part as "a development in which not less than thirty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that, for at least forty years after the initial occupation of the proposed development, such dwelling units shall be sold or rented at, or below, prices which will preserve the units as housing for which persons and families pay thirty per cent or less of their annual income, where such income is less than or equal to eighty per cent of the median income").

In its application for a site plan approval and a certificate of zoning compliance, the plaintiff listed the height of the proposed building as "53.1 [feet] +/-." At the public hearing on the applications, the plaintiff described the building as having a peak height of sixty feet. Citizens addressed the proposal, and some expressed concern that the development would adversely impact the nearby historic district or "[encroach] on their neighborhood."[2]

Various experts also discussed the proposal at the public hearing. Daryn Reyman-Lock, an architectural historian and archaeologist with a Ph.D. in archaeology, "specifically [in] architecture in the sense of place and placemaking," noted that "the Beach Road access point helps [to] create a definitive feel for what to expect within the local historic district." When asked whether "there [is] an adverse impact on the historic character of [the] historic district by virtue of [the proposed] development," Reyman-Lock replied, "[a]bsolutely. There's

---

[2] For example, Alden H. Stevens, one of the intervenors, stated at the public hearing: "I'm just concerned with the size of the proposed building. I recognize that Fairfield needs affordable housing, and I think that that could be accomplished with a building that has fewer than 40 units and still adheres to the 30 percent rule for affordable housing. I just think that this proposed building is too dense, too high, and the footprint is too big for this district." Additionally, an estimated 800 to 1400 citizens signed a petition against the proposal. Certain state legislators also spoke out against the proposal.

Others registered their support for the proposal. For example, Reverend David W. Spollett of First Church Congregational, which is located on Beach Road just across from the subject property, wrote: "Yes, 131 Beach [Road] 'is across from the historical First Church Congregation[al] that dates its founding back to 1640.' However, the church does not feel [that] its 'historical significance will be irreparably damaged' [or] that this 'project is inconsistent and is potentially very damaging to the historical nature of that neighborhood and of the town.' Indeed the commitment and legacy of First Church since the [seventeenth] century has been to provide help, housing and hope for the least among us. I disagree that the 'legacy of those properties . . . the[ir] historical significance is more important.' Indeed, it is self-evident that the provision of affordable [housing] in the proposal for 131 Beach Road is a fulfillment of the legacy of First Church and the history of the town."

a negative visual impact because of the development." She also criticized the proposed building design, stating, "I looked at what was being proposed design wise for this new building, this § 8-30g, and, you know, the design is grossly out of proportion with the character defining features of not only the local historic district but also the approach to it via Beach Road." She further commented, "[a]s many others have noted, I think it is too high. The largest building on Beach Road is three stories high. . . . What I would suggest is lowering it two stories . . . ." Adam Klyver, the Fairfield Historic District Commission chair and a licensed architect, also testified against the proposal. When asked whether "this proposed project would adversely affect the character of the historic district by virtue of being visible there and affect[ing] the streetscape," he responded, "[y]es."[3]

The plaintiff, meanwhile, emphasized that the subject property is not located in, and does not even abut, the historic district. The plaintiff also demonstrated that more than 80 commercial businesses are within a 500 foot radius of the subject property, including the Fairfield Shopping Center, a car dealership, a gas station, a funeral home, and various medical buildings. The plaintiff further observed that 10 residences are within a 500 foot radius of the subject property, only 8 of which are in the historic district. The plaintiff additionally noted that the subject property is surrounded by

---

[3] Regarding the building's visibility from the historic district, Klyver was asked whether it is his "position that . . . the subject property of this application would be visible from" 145 Old Post Road "in the historic district," as well as other properties to "the east of that along Old Post Road that also abut the . . . subject property [and] that are in the historic district," including "First Church," "a portion of Beach Road and the intersection . . . with Old Post Road," and Fairfield's "old town hall . . . ." He replied, "Yeah. I would think it would be."

Klyver and state Senator Tony Hwang also echoed Reyman-Lock's observation that Beach Road serves as a transition into the historic district.

existing mature trees, some of which are more than 100 feet tall, which would shield the visual impact of the development to some extent.[4]

The parties also presented evidence regarding the need for affordable housing in Fairfield. The plaintiff cited data from the state Department of Housing showing that, out of "approximately 21,648 dwellings . . . only 2.43 percent of [Fairfield's] housing stock qualifie[d] as either government assisted or deed restricted in compliance with § 8-30g" in 2018, and that, in 2019, the stock had increased to only 2.47 percent. The plaintiff noted that Fairfield's stock has actually decreased since 2000, when the figure was at 2.71 percent. The figure decreased to 2.69 percent by 2011. The plaintiff also quoted the Appellate Court's discussion of Fairfield's affordable housing record in *Garden Homes Management Corp.* v. *Town Plan & Zoning Commission*, 191 Conn. App. 736, 756, 216 A.3d 680, cert. denied, 333 Conn. 933, 218 A.3d 594 (2019): "[W]e begin our analysis by noting [that] the record is replete with evidence of the need for affordable housing in Fairfield. This need has persisted for decades . . . ."

---

[4] The parties disagreed as to how effectively these trees would screen the building. For example, Matthew Wagner, the chairman of the commission, said to Glen Tatangelo, a member of 131 Beach Road, LLC: "The question was whether in light of the existing [treescape] and the screening and how you anticipate the building to be built, would it be viewable from [the] vantage point [of one standing on the corner of Beach Road and Old Post Road in front of the Episcopal Church]? I think the answer is [that] portions will be [visible] but other portions will be screened. But I'd like some clarity on that, just to put a fine point on it. Not with respect to what other people have presented and what other people have said, but from your perspective." Tatangelo replied, "I think you will see very little of the building."

In its formal decision, the commission found that "[t]here are nearby trees on adjacent properties that provide some screening, but those trees would not completely screen the proposed building, nor would some trees provide year-round screening. The trees are also not the [plaintiff's] responsibility, so if they fell or were cut down, there would be no mechanism to force a replacement, ignoring the fact that the replacement would need to be [full-grown] to provide the same level of screening."

The commission sought to portray the situation differently. It requested Mark Barnhart, Fairfield's director of community and economic development, "to put in the record where [Fairfield] stand[s] . . . on affordable housing." Barnhart explained that Fairfield has established a trust fund that has raised approximately $800,000 to convert former military housing into affordable housing. He also discussed projects that are "in the pipeline," as well as "a great number of projects that are approved" but "haven't yet started construction," asserting that Fairfield is "making progress." However, he also acknowledged that, to qualify as affordable housing under § 8-30g, dwellings must be fully constructed and issued certificates of occupancy. When asked whether, "in [his] professional opinion," he "believe[d] that . . . Fairfield ha[d] taken substantial steps to meet the need for affordable housing in the community," he replied, "[y]es."

Following a public hearing, the commission voted to deny the text amendment for the following reasons: (1) "[t]he proposed amendment is inconsistent with the [p]lan of [c]onservation and [d]evelopment," (2) "[t]ime, experience and responsible planning for contemporary or future conditions [do] not reasonably indicate the need for the proposed amendment," (3) "[i]t has not been demonstrated that the proposal is warranted and would serve the general health, welfare and safety of [Fairfield]," (4) "[t]he proposed amendment would provide a level of development that would not serve to protect property values in the community," and (5) "[t]he amendment would provide a level of development that would increase undue traffic congestion."

The commission approved the site plan and certificate of zoning compliance but imposed two conditions, which required that the plaintiff (1) "secure the requisite permission and/or approval to remove the [on street] parking spots as recommended in the [plaintiff's] traffic

report to create [a] safe [line of sight]," and (2) "return to the [c]ommission with a revised plan for the building to be no more than three stories total [rather than five] and [for its] height not to exceed [forty] feet [rather than sixty feet], with adequate parking." The commission stated that it imposed the condition limiting the building's height because the "building [as proposed would] be visible in the historic district," and "[t]his visibility would vitiate the integrity of the historic district." The commission explained that the height restriction was based on its conclusion that "preserving Fairfield's [h]istoric [d]istrict is a 'substantial public interest that this [c]omission may legally consider' " and on its decision to accept "testimony from experts and laypeople [asserting] that this building would irreparably impair the historic district . . . ."

The plaintiff appealed from the commission's decision to the Superior Court pursuant to General Statutes §§ 8-8 and 8-30g (g), claiming, among other things, that the commission's decision to deny the zone text amendment was not supported by substantial evidence in the record and that the commission "failed to state a valid reason, as mandated by [§] 8-30g, for denying . . . [the] amendment . . . ." The plaintiff further claimed that the decision to conditionally grant the site plan and certificate of zoning compliance was "not supported by an identified and quantified harm to a substantial public interest that clearly outweigh[ed] the need for affordable housing and otherwise fail[ed] to comply with [§] 8-30g . . . ." The plaintiff also claimed that the restriction on the height of the building would reduce the number of residential units, rendering the affordable housing development "not financially viable."

Four intervenors filed their own zoning appeal and also intervened in the plaintiff's appeal, claiming in both cases that the commission's approval of the site plan and certificate of zoning compliance, even with the

imposed conditions, was illegal, unlawful, arbitrary and capricious. See footnote 1 of this opinion. The trial court, *Hon. Marshall K. Berger*, judge trial referee, consolidated the intervenors' appeal with the plaintiff's appeal.

The trial court sustained the plaintiff's zoning appeal with respect to the zone text amendment on the ground that the commission improperly had failed to "[consider] the text amendment in light of § 8-30g (g) . . . ." The court concluded that "[t]he commission was required to apply § 8-30g (g) in its consideration of the text amendment" but that the commission instead "mostly discussed that a text amendment was not needed." As to the conditional approval of the site plan and certificate of zoning compliance, the court sustained the plaintiff's appeal and dismissed the intervenors' appeal.[5] The court concluded that "the commission ha[d] not met its burden [of] prov[ing] . . . that the conditions of approval [on] the [application] . . . were necessary to protect a substantial public interest outweighing the need for affordable housing" and emphasized "the simple fact . . . that the proposed development is not in the historic district." This appeal followed.[6] We address the issues in reverse order for ease of presentation.

[5] The trial court reversed the commission with respect to both conditions it had imposed, namely, removal of the on street parking spaces and the height restrictions. The defendants do not challenge in this court that portion of the trial court's judgment reversing the decision of the commission requiring the plaintiff to remove on street parking spots, and we therefore address only the conditions limiting the building's height to three stories and no more than forty feet. Unless otherwise indicated, all future references in this opinion to the height restriction encompass both the three story and the forty foot conditions.

[6] The commission and the intervenors each filed separate petitions for certification to appeal from the trial court's judgment rendered in connection with the plaintiff's zoning appeal, and the intervenors also filed a separate petition for certification to appeal in connection with their zoning appeal. See General Statutes § 8-8o. The Appellate Court granted all three petitions and consolidated the intervenors' appeals sua sponte. We subsequently transferred the commission's appeal and the intervenors' consolidated appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book

## I

### SITE PLAN AND CERTIFICATE
### OF ZONING COMPLIANCE

The defendants claim that the trial court erroneously concluded that the commission had not met its burden under § 8-30g (g) of proving that the height restriction was necessary to protect a substantial public interest that outweighed the need for affordable housing. They contend that "the record contained significant evidence that the massive nature of the proposed building, particularly its sixty foot height, would negatively impact the neighboring historic district" and that the court "failed to take into account the breadth of the evidence" and "glossed over the credentials of experts who testified . . . ." The intervenors further assert that the trial court improperly substituted its judgment for that of the commission in eliminating the height restriction and in finding that the need for affordable housing outweighed the need to protect the character of the historic district.

The plaintiff argues in response that the testimony of the experts and laypeople "involves speculative and conclusory statements" and that "[n]o one identifies or explains how the proposal will actually harm the nearby historic district." The plaintiff adds that "viewsheds from the nearby historic district [do not] regulate or control development outside of the historic district" and that "one [cannot] extend the jurisdiction of the historic district to properties outside of the district based on how far one can visually see from the district . . . ." In summary, the plaintiff contends that "[t]he commission failed to identify and quantify a harm to the nearby historic district associated with the height of [the] proposed building, whereby the [height] restric-

§ 65-1. Although the commission's appeal was not consolidated with the intervenors' appeals, for purposes of judicial economy, we address the claims raised in all three appeals in this opinion.

tion . . . is necessary and clearly outweighs the need for affordable housing in Fairfield." We agree.

Section 8-30g (g) provides in relevant part: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission, that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development . . . . If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."

We previously have described in some detail the analysis that the trial court should conduct to implement the statutory scheme. "[I]n conducting its review in an affordable housing appeal, the trial court must first determine whether 'the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record.' . . . Specifically, the court must determine whether the record establishes that there is more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest if the application is granted. If the court finds that such sufficient evidence exists, then it must conduct a plenary review of the record and determine independently whether the com-

mission's decision was necessary to protect substantial interests in health, safety or other matters that the commission legally may consider, whether the risk of such harm to such public interests clearly outweighs the need for affordable housing, and whether the public interest can be protected by reasonable changes to the affordable housing development." (Citation omitted.) *River Bend Associates, Inc.* v. *Zoning Commission,* 271 Conn. 1, 26, 856 A.2d 973 (2004); see, e.g., *Brenmor Properties, LLC* v. *Planning & Zoning Commission,* 326 Conn. 55, 63 n.6, 161 A.3d 545 (2017); *Carr* v. *Planning & Zoning Commission,* 273 Conn. 573, 596–97, 872 A.2d 385 (2005). "[Although the] commission remains the finder of fact and any facts found are subject to the sufficient evidence standard of judicial review . . . [the] application of the legal standards set forth in § 8-30g (g) . . . to those facts is a mixed question of law and fact subject to plenary review." (Internal quotation marks omitted.) *Garden Homes Management Corp.* v. *Town Plan & Zoning Commission,* supra, 191 Conn. App. 752.

We have no disagreement with the general proposition that, unless the law at issue indicates otherwise, historic preservation is among the panoply of interests that a zoning commission may properly consider when determining whether considerations of public health or safety militate against approval of the particular proposal under consideration. See *Smith* v. *Zoning Board of Appeals,* 227 Conn. 71, 86, 629 A.2d 1089 (1993) (holding that legal authority to enact zoning regulations for protection of " 'public health and safety' " includes consideration of environmental factors, which, in turn, includes historical factors), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994). Thus, although the statutory scheme governing affordable housing does not expressly require consideration of historic preservation as a public interest that must be taken into account

in the specific context of affordable housing applications, it is enough that the public interest in health and safety must be considered because our holding in *Smith* teaches that historic preservation is a component part of that factor. This conclusion is buttressed by the fact that the general enabling act authorizing municipalities to enact zoning regulations requires, among other things, that such regulations "[b]e made with reasonable consideration for the protection of historic factors"; General Statutes § 8-2 (c) (2); and "[b]e designed to . . . protect the state's historic, tribal, cultural and environmental resources . . . ."[7] General Statutes § 8-2 (b) (2) (E). The Fairfield Town Charter specifically cites the enabling act, declaring that the commission "shall have all the powers and duties conferred by this Charter, by ordinance, and on zoning commissions and planning commissions generally by Chapter 124 and Chapter 126 of . . . General Statutes . . . § 8-1 et seq. and § 8-18 et seq. . . ." Fairfield Town Charter § 8.5 (B). Accordingly, the commission can consider historic preservation in assessing affordable housing applications under § 8-30g (g).

But, of course, the mere fact that historic preservation can constitute a substantial public interest appropriate for consideration in connection with an affordable housing application does not establish anything more than a theoretical possibility of harm to that interest

---

[7] Section 8-2 was amended in 2021 to add this latter provision. See Public Acts 2021, No. 21-29, § 4 (P.A. 21-29). It is noteworthy that P.A. 21-29 also deleted the statutory language, previously contained in § 8-2 (b) (3), requiring a commission enacting zoning regulations to consider the "character" of the district and substituted in its place a requirement to consider the "physical site characteristics" of the district." P.A. 21-29, § 4. Taken together, these amendments demonstrate an intent to focus a commission's consideration on the specific physical or historical factors implicated by the regulation at issue and to eschew the vague and highly subjective evaluation entailed in considering a district's "character." We agree with the trial court's observation that much of the testimony at the public hearing in the present case concerned the impact on the character of the neighboring historic district.

or indicate that the record in this particular case establishes that (1) the proposed development implicates a substantial interest in historic preservation, (2) the commission's decision is "necessary" to protect that interest, (3) the interest is "clearly outweigh[ed] [by] the need for affordable housing," and (4) the interest "cannot be protected by reasonable changes to the affordable housing development . . . ." General Statutes § 8-30g (g). Our thorough review of the record in the present case leads us to conclude that the trial court correctly determined that the commission was unable to sustain its burden of proof. It is not obvious to us that any substantial interests in historic preservation are implicated in this case, and, even if they are, the commission has not met its burden of demonstrating that its imposition of the height restriction as a condition of approval was necessary to protect a public interest that clearly outweighed the need for affordable housing in Fairfield.

A lengthy analysis of these issues is unnecessary because the trial court's cogent analysis leaves little more for us to say. The defendants' claim is not that the proposed development will adversely impact the public interest *within* the district in which the development will be located; that claim cannot credibly be made because the development itself will not be located within (or even abut) the historic district. Instead, the substantial public interest that the defendants claim overrides the need for public housing is a visual impact that will be felt in a different zoning district—or, more accurately, in a part of that neighboring district. None of the cases cited by the defendants involves adverse impacts, much less solely visual impacts, that are felt only outside of the zoning district in which the proposed development will be built. Although we do not rule out the potential viability of such a claim under different circumstances, the particular nature of the out-of-dis-

trict impact at issue in the present case fails to implicate a substantial interest in historic preservation. The public interest in the preservation of historic sites is clear, but we cannot say the same about the interest in protecting the viewsheds from those sites, especially the views extending into other districts, and especially as a consideration that may be invoked to thwart "the legislative purpose of [§ 8-30g of] encouraging the construction of affordable housing." *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 164, 653 A.2d 798 (1995).

A fundamental precept of zoning law, after all, is that different zoning districts will permit different and sometimes incompatible uses subject to different regulations with respect to everything from "the height, size, and location of buildings and structures, [to] the percentage of the area of the lot that can be occupied, the size of lots, setbacks, and . . . the use of land, buildings, and structures." D. Merriam, 9 Connecticut Practice Series: Land Use Law and Practice (2024 Ed.) § 3.5, p. 38; see also General Statutes § 8-2 (a) (2) ("[a]ll zoning regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district"). A historic district by its very nature is particularly apt to encounter abrupt transitions at its boundaries. These transitional features may include buildings or other structures, visible from within the historic district, that are obviously dissimilar in certain respects, architecturally and otherwise. As the trial court observed, the proposed development is already within 500 feet of more than 80 commercial businesses, including such distinctly modern commercial operations as a gas station, a car dealership, a shopping center, and medical offices, including a 3 story medical office building. The nature and extent of the commercial activity prevalent in the neighborhood undermine the defendants' assertion that the height

restriction is necessary to protect a substantial public interest in the historic preservation of buildings located in a different district.

Indirect but significant support for our conclusion can be found in the statutory scheme authorizing municipalities to create historic districts. General Statutes § 7-147a (b) authorizes a municipality to establish "an historic district or districts to promote the educational, cultural, economic and general welfare of the public through the preservation and protection *of the distinctive characteristics of buildings and places* associated with the history of or indicative of a period or style of architecture of the municipality, of the state or of the nation." (Emphasis added.) The focus of the statute is on the distinctive characteristics of historic places and structures. See *Gibbons* v. *Historic District Commission,* 285 Conn. 755, 773, 778, 941 A.2d 917 (2008) (reversing historic district commission's denial of property owner's application to relocate outbuilding within district because record did not contain substantial evidence demonstrating "that either the current location of the . . . outbuilding or the design of the building itself is historically significant or has historical value because of its relationship to [the historic district]"). The statutory scheme created to safeguard the public interest in historic preservation contains no indication that this interest includes consideration of the potential visibility from the historic district of a building or structure that would be located in another zoning district entirely.

In this regard, we also find it noteworthy that the scope of the authority of Fairfield's historic district commission is limited to determining the appropriateness of (1) any proposal to build or alter any "architectural feature" of a new or existing building or structure within the historic district, and (2) any area within the district for industrial, commercial, business, home

industry or occupational parking. See General Statutes § 7-147s. Although the statutory scheme does not expressly limit a municipal historic district commission's authority in connection with matters outside of a historic district, these provisions help illuminate what the legislature intended with respect to the scope of a municipality's interest in historic preservation. That interest involves preserving the architectural features of historic buildings and structures themselves. Imposing limits on the construction of affordable housing outside of a historic district is not part of the statutory scheme.

Even if we were to assume, for the sake of argument, that the legislature intended a substantial public interest in historic preservation to extend to surrounding districts within view of the historic district, and that the commission's decision in the present case was necessary to protect a substantial public interest in historic preservation, we nonetheless agree with the trial court that the commission failed to prove that the restriction it had imposed to protect that interest clearly outweighed the need for affordable housing in Fairfield. On this point, the commission asserted that "Fairfield (and this [c]ommission in particular) has amply demonstrated a serious commitment to affordable housing and increasing its affordable housing units," and cited the testimony of Barnhart in support of that conclusion. Without doubting Fairfield's laudable commitment to change, however, the fact remains that its housing stock qualifying as either government assisted or deed restricted in compliance with § 8-30g amounted to only 2.47 percent in 2019. Barnhart described numerous efforts that Fairfield had taken to increase its stock, including the establishment of a trust fund and the approval of "a great number of projects" that would eventually increase access to affordable housing in the town. He also acknowledged, however, that these projects were only "in the pipeline" and had not yet increased access to

affordable housing in Fairfield. Instead, affordable housing in Fairfield has decreased since 2011. On this record, the trial court correctly concluded that the commission had failed to demonstrate that whatever interest it has in historic preservation does not clearly outweigh the need for affordable housing.

The intervenors contend that the trial court improperly substituted its judgment for that of the commission in eliminating the height restriction and in finding that the need for affordable housing outweighed the need to protect the character of the historic district. Citing No. 21-29, § 4, of the 2021 Public Acts, which amended § 8-2,[8] the intervenors assert that these amendments illustrate "that there is a substantial public interest in protecting historic and cultural resources, and that physical site characteristics, such as land and building elevation, building design and materials, landscape features and proximity to designated historic structures and streetscapes, are appropriate factors for zoning commissions to consider when acting in their legislative capacity to balance relevant, and competing, public interests." The intervenors argue that, by "striking the building height condition and . . . failing to remand the matter to the commission to consider whether alternative conditions, such as design modifications, could protect historic resources, the [trial court] both improperly substituted its own judgment for that of the commission and also ignored the great weight of the evidence."

We reject any suggestion that the trial court substituted its judgment for that of the commission by con-

---

[8] Section 8-2 was amended in 2021 to require regulations to "[b]e designed to . . . protect the state's historic, tribal, cultural and environmental resources" and to eliminate the requirement that a zoning authority consider the "character" of the district factor, substituting for that factor the requirement that the zoning authority consider "physical site characteristics . . . ." Public Acts 2021, No. 21-29, § 4; see General Statutes § 8-2 (b) (2) (e) and (3).

cluding that the commission had not met its burden of proving that the height restriction imposed was necessary to protect a substantial public interest outweighing the need for affordable housing. The court's conclusions in its memorandum of decision were based on a careful and thorough review of the public hearing testimony, including expert testimony regarding the development and its potential impact on the historic district, as well as the need for affordable housing in Fairfield. The court considered the evidence relating to the height of the proposed building, its potential visibility, and any adverse impact that might result, and deemed that evidence insufficient to satisfy the commission's burden under § 8-30g (g). The court's conclusion ultimately was based on its fair and objective assessment of the strong and statistically verifiable need for affordable housing in Fairfield weighed against the relatively weak claim that the proposed development threatened the public interest in the historic preservation of the visual integrity of a portion of an adjoining zoning district. We cannot agree that the trial court substituted its judgment for that of the commission in so concluding given the manifest weight of the evidence in the record before us.

In sum, the trial court applied the correct legal standards set forth in § 8-30g (g) and correctly determined that the commission had failed to satisfy its burden of proof on this record.

## II

## ZONE TEXT AMENDMENT

We next address whether the trial court properly concluded that the plaintiff's application for a zone text amendment was part of an "affordable housing application," as defined by § 8-30g (a) (2). The defendants contend that § 8-30g does not apply to the plaintiff's proposed zone text amendment because the

application sought to create a new permissible use that was not limited to the boundaries of the subject property but, instead, extended throughout the entire residence A zone district. The plaintiff responds that its application plainly and unambiguously is governed by § 8-30g because it was filed "in connection with" an affordable housing development. We conclude that the plaintiff's application falls within the scope of § 8-30g to the extent that it sought a zone text amendment that will govern the affordable housing development on the subject property, but not to the extent that it sought to modify the zoning regulations governing the rest of the residence A zone district. Because the parties have no objection to limiting the proposed zone text amendment to the subject property, we remand with direction to grant the plaintiff's application for a zone text amendment limited solely to the subject property.

Whether § 8-30g applies to the plaintiff's application for a zone text amendment is an issue of statutory construction over which our review is plenary. See, e.g., *JPI Partners, LLC* v. *Planning & Zoning Board*, 259 Conn. 675, 687, 791 A.2d 552 (2002). We begin our analysis with the language of the statute. See General Statutes § 1-2z. The term "affordable housing application" is defined as "any application made to a commission *in connection with* an affordable housing development by a person who proposes to develop such affordable housing . . . . " (Emphasis added.) General Statutes § 8-30g (a) (2). An "affordable housing development" includes a "set-aside development"; General Statutes § 8-30g (a) (1) (B); which is defined in relevant part as "a development in which not less than thirty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that, for at least forty years after the initial occupation of the proposed development, such dwelling units shall be sold or rented at, or below, prices which will preserve

the units as housing for which persons and families pay thirty per cent or less of their annual income, where such income is less than or equal to eighty per cent of the median income. . . ."[9] General Statutes § 8-30g (a) (6).

It is undisputed that the plaintiff is "a person who proposes to develop" an "affordable housing development" as defined by § 8-30g (a) (2) and (6). It is further undisputed that the plaintiff's application for a proposed text amendment was submitted simultaneously with, and as a component of, its application for an affordable housing development on the subject property. The only disputed issue is whether the plaintiff's application was submitted "in connection with" the plaintiff's affordable housing development in light of the fact that it sought to create a new permitted use (i.e., "[multifamily] dwelling units for rent or sale . . . with a housing opportunity or affordable housing component that qualify as 'affordable,' as provided by [§] 8-30g") throughout the residence A zone districts.[10]

We previously have considered the meaning of the phrase "in connection with," as used in § 8-30g (a) (2). In *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 636 A.2d 1342 (1994), we addressed whether an application "for a zone change

---

[9] An "affordable housing development" also includes "assisted housing"; General Statutes § 8-30g (a) (1) (A); which is defined as "housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 319uu or Section 1437f of Title 42 of the United States Code . . . ." General Statutes § 8-30g (a) (3).

[10] Although the proposed text amendment applies to the entire zone, the plaintiff points out that only two parcels of land in the district other than the subject property meet the bulk, area, dimensional, and open space requirements to qualify for the new permitted use and that anyone seeking to build an affordable housing development on either of those two parcels would have to submit an affordable housing application in accordance with § 8-30g.

and special development district designation to construct ten units of affordable housing on property located in West Hartford" was an affordable housing application, as defined by § 8-30g (a) (2). Id., 500; see id., 506. We rejected the claim that § 8-30g applies only to a zoning commission's administrative, as opposed to legislative, decisions, reasoning that the plain and unambiguous language of the statute applies to "*any* application made to a commission *in connection with* an affordable housing development" and that "the statute contains no exceptions or qualifications limiting the definition of an affordable housing application to certain types of applications to zoning commissions." (Emphasis in original; internal quotation marks omitted.) Id., 508–509. Given the ordinary meaning of the terms "any" and "in connection with," as well as the legislative purpose "to encourage and facilitate the much needed development of affordable housing throughout the state," we "refuse[d] to construe § 8-30g to include an implied limitation that would be . . . antithetical to the intent of the legislature." Id., 511. We therefore held that § 8-30g applies to the "legislative decision [of a zoning commission] to grant or deny a zone change." Id., 508; see also *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 140 ("[a]s a remedial statute, § 8-30g must be liberally construed in favor of those whom the legislature intended to benefit" (internal quotation marks omitted)).

In *West Hartford Interfaith Coalition, Inc.*, the statutory criteria in § 8-30g (a) (1) and (2) were met because the developer sought a zone change from a commission for a particular parcel of land on which it proposed to build affordable housing units. See *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, supra, 228 Conn. 503. The defendants argue that the statutory criteria in § 8-30g (a) (2) are not met in the present case because the plaintiff's application for a zone text

amendment is not limited to the subject property but, instead, applies to the entire residence A zone district. In support of this argument, the defendants rely on the Appellate Court's decision in *Stefanoni* v. *Dept. of Economic & Community Development*, 142 Conn. App. 300, 70 A.3d 61, cert. denied, 309 Conn. 907, 68 A.3d 661 (2013).

The defendants' reliance on *Stefanoni* is misplaced. *Stefanoni* is readily distinguishable from the present case because it involved an application by the plaintiffs, Christopher and Margaret Stefanoni, to amend the zoning regulations to create an affordable housing floating zone that "would be applied to all properties in Darien including the [Stefanonis'] property at 149 Nearwater Lane." (Internal quotation marks omitted.) Id., 305. The application was denied, and the Appellate Court determined that § 8-30g was inapplicable because the connection between the Stefanonis' proposed floating zone and an affordable housing development was "too attenuated." Id., 312. *Stefanoni* thus holds that the statutory criteria in § 8-30g are not met if a developer files an application to create a floating zone related to an affordable housing development that is not "descended" on a specific parcel of land.[11] Id. As the Appellate Court pointed out, the Stefanonis' "application was for the creation of a floating zone for the whole town, not a zone change for a specific parcel," and the "addition of a single page 'conceptual site plan'" featuring the property at 149 Nearwater Lane was "not enough to transform the floating zone creation application into an affordable housing application," as defined by § 8-30g (a) (2). (Emphasis omitted.) Id., 310.

---

[11] "By definition, a floating zone does not apply to a specifically described parcel of land. . . . A floating zone differs from the traditional Euclidean zone [which has definite bounds] in that it has no defined boundaries and is said to float over the entire area where it may eventually be established." (Internal quotation marks omitted.) *Stefanoni* v. *Dept. of Economic & Community Development*, supra, 142 Conn. App. 310.

Unlike the plaintiffs in *Stefanoni*, the plaintiff in the present case plans to construct an affordable housing development on a specific parcel of land, and its application for a zone text amendment was submitted as part of its application to the commission for site plan approval to develop affordable housing units on the subject property. Insofar as the plaintiff's application sought to change the text of the zoning regulations governing the subject property, we conclude that it was filed "in connection with" the plaintiff's affordable housing development within the meaning of § 8-30g (a) (2).

Our conclusion finds support in the text of subsection (b) (1) of § 8-30g, which provides in relevant part that "[a]ny person filing an affordable housing application with a commission shall submit, as part of the application, an affordability plan which shall include at least the following . . . (E) *draft zoning regulations*, conditions of approvals, deeds, restrictive covenants or lease provisions *that will govern the affordable dwelling units*." (Emphasis added.) As we explained in *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 271 Conn. 1, there is "no requirement" that an applicant "obtain a zone change in order to obtain approval of [an affordable housing development] site plan," but the legislature plainly contemplated that "an affordable zoning applicant [will] submit draft zoning regulations in support of its application." Id., 6 n.2; see also *Stefanoni* v. *Dept. of Economic & Community Development*, supra, 142 Conn. App. 312 (holding that "a town-wide affordable housing floating zone" was not necessary because "[§] 8-30g already empowers any property owner . . . to come before the commission with an application for an affordable housing project to be built on their land"); *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 315, 655 A.2d 1146 ("No formal zone change application is needed because [§ 8-30g] is

designed to allow circumvention of the usual exhaustion of zoning remedies and to provide prompt judicial review of a denial of an application. . . . Embodied in the . . . application for an affordable housing subdivision is a zone change." (Citations omitted.)), cert. denied, 233 Conn. 909, 658 A.2d 981 (1995). Thus, although the plaintiff was "not *required* to" file an application for a zone text amendment to build an affordable housing development, it nonetheless statutorily was "*entitled*" to seek a change in the zoning regulations governing the subject property "and to have the application considered by the zoning commission under the standards set forth in § 8-30g (g)."[12] (Emphasis in original.) *River Bend Associates, Inc.* v. *Zoning Commission*, supra, 6–7 n.2.

The foregoing analysis does not fully resolve the present case, however, because the plaintiff's proposed zone text amendment was not limited to the affordable housing development on the subject property—it sought to change the regulations governing the entire residence A zone district, including parcels that were not part of the proposed development. Insofar as the proposed text amendment would apply outside of "an affordable housing development by a person who proposes to develop such affordable housing," we conclude that it was not submitted "in connection with" an affordable housing development, as contemplated by § 8-30g (a) (2). To construe the statute otherwise would be inconsistent with the language of subsections (a) (2) and (b) (1) (E), as well as the legislative intent and purpose of the statute.[13] As we explained in *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 122, § 8-30g was not

[12] For this reason, we reject the defendants' claim that the commission properly denied the plaintiff's application to amend the zoning regulations on the ground that such an amendment was not "needed with an affordable housing application." (Internal quotation marks omitted.)

[13] To the extent that the language of § 8-30g (g) is ambiguous, we consult extratextual evidence of legislative intent in accordance with § 1-2z.

intended to effectuate " 'any kind of general zoning override.' " Id., 138, quoting 32 S. Proc., Pt. 12, 1989 Sess., p. 4048, remarks of Senator Richard Blumenthal. Instead, the statute applies to " 'an actual developer . . . who wants to build something, who has plans to build it . . . and has been turned down.' " *Kaufman* v. *Zoning Commission*, supra, 138, quoting Conn. Joint Standing Committee Hearings, Planning and Development, Pt. 1, 1989 Sess., p. 304, remarks of Attorney Raphael Podolsky. The statute does not apply to " 'theoretical zoning' "; it applies only to " 'specific projects on particular pieces of land . . . .' " *Kaufman* v. *Zoning Commission*, supra, 138. Accordingly, we hold that § 8-30g did not govern the plaintiff's request for a zone text amendment to the zoning regulations governing any property other than the subject property on which the proposed affordable housing development is to be built.

A concern was raised at oral argument that limiting the definition of an "affordable housing application" in § 8-30g (a) (2) in this manner could be understood as an endorsement of spot zoning, which is generally prohibited. "[S]pot zoning is the reclassification of a small area of land in such a manner as to disturb the tenor of the surrounding neighborhood." (Internal quotation marks omitted.) *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 591–92, 930 A.2d 1 (2007). Spot zoning is often considered impermissible because it benefits an individual property owner at the expense of the community's interest in a harmonious, comprehensive zoning plan. See, e.g., *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 161–62, 292 A.2d 893 (1972); *Bartram* v. *Zoning Commission*, 136 Conn. 89, 93–94, 68 A.2d 308 (1949). But not always. If the zoning "would serve the best interests of the community as a whole to permit a use of a single lot or small area in a different way than was allowed in [the] surrounding territory, [a commission] would not be guilty of spot zoning in any

sense obnoxious to the law." *Bartram* v. *Zoning Commission*, supra, 94.

By enacting § 8-30g, the legislature has made the public policy determination that the interests of the community are best served by "providing fair access to housing and expanding housing opportunities for all citizens of Connecticut . . . ." (Internal quotation marks omitted.) *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 595–96, 735 A.2d 231 (1999). Because the legislature has made the statutory determination that an affordable housing application need not comply with the zoning regulations in the surrounding area, the legislature necessarily has determined that the strong public policy in favor of fulfilling the critical need for the development of affordable housing throughout the state outweighs the general community interest in a comprehensive zoning plan. See, e.g., *Stefanoni* v. *Dept. of Economic & Community Development*, supra, 142 Conn. App. 312; *Wisniowski* v. *Planning Commission*, supra, 37 Conn. App. 315, 317–18. Stated simply, the legislature has determined that affordable housing developments that meet the statutory criteria set forth in § 8-30g are in the best interests of the community and that granting an affordable housing application limited to a specific parcel of land does not constitute spot zoning.

Having determined that the plaintiff's application for a zone text amendment was governed by § 8-30g insofar as it sought a change in the zoning regulations applicable to the subject property, we address the appropriate remedy.[14] Section 8-30g authorizes "much more expansive remedies than are available to courts in traditional

[14] There is no claim on appeal that the commission's decision to deny the plaintiff's application for a zone text amendment as applied solely to the subject property was "necessary to protect substantial public interests in health, safety or other matters which the commission may legally consider . . . ." General Statutes § 8-30g (g) (1) (A).

zoning appeals." *AvalonBay Communities, Inc.* v. *Zoning Commission*, 284 Conn. 124, 140 n.15, 931 A.2d 879 (2007). Subsection (g) of § 8-30g in particular provides in relevant part that, "[i]f the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." Pursuant to this provision, the plaintiff asks this court "to 'modify' the zone text amendment, so the amendment . . . applies [only] to the subject property." The commission "does not object to such an amendment applying only to an applicant's property, including the property that is the subject of this appeal."[15] Consistent with the position of the parties and the broad remedial powers that § 8-30g (g) affords us, we remand to the trial court and order that court to remand to the commission with direction to grant the plaintiff's application for a zone text amendment only as it effectuates a change in the zoning regulations that govern the subject property.

The judgments are reversed with respect to the trial court's determination concerning the commission's denial of a zone text amendment applicable to the residence A zone district and the cases are remanded to the trial court with direction to remand to the commission and to order the commission to grant the plaintiff's application for a zone text amendment limited solely to the subject property; the judgments are affirmed in all other respects.

In this opinion the other justices concurred.

---

[15] The intervenors, who adopted the commission's arguments in full, also have no objection to this remedy.